# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00355-CV

---

**G. B. and T. B., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 274TH DISTRICT COURT OF HAYS COUNTY**
**NO. 18-0782, THE HONORABLE DAVID JUNKIN, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Mother, T.B., and Father, G.B., filed notices of appeal from the trial court's final order terminating their parental rights to their children—daughter Cary, who was almost four at the time of the hearing, and son Greg, who was almost three.[1] Mother's attorney has since filed a brief concluding that her appeal is frivolous and without merit.[2] Father argues on appeal that the evidence is legally and factually insufficient to support the trial court's finding that termination is in the children's best interest. *See* Tex. Fam. Code. § 161.001(b)(2). We will affirm the trial court's order of termination.

---

[1] To protect the children's privacy, we refer to the children and their family members by their initials or by aliases. *See* Tex. R. App. P. 9.8.

[2] *See In re P.M.*, 520 S.W.3d 24, 27-28 (Tex. 2016) ("Counsel's obligation to the client may still be satisfied by filing an appellate brief meeting the standards set in *Anders v. California*, [386 U.S. 738 (1967),] and its progeny."); *Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 646-47 & n.4 (Tex. App.—Austin 2005, pet. denied).

## STANDARD OF REVIEW

To terminate a parent's rights to their child, the Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to a statutory ground for termination and that termination is in the child's best interest. *Id*. § 161.001; *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is the level of proof "that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In reviewing the sufficiency of the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

In evaluating the legal sufficiency of the evidence, we look at "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *Williams v. Williams*, 150 S.W.3d 436, 449 (Tex. App.—Austin 2004, pet. denied). We "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so" and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *J.F.C.*, 96 S.W.3d at 266. Our review does not require that we disregard undisputed evidence contrary to the determination. *K.M.L.*, 443 S.W.3d at 113. If after viewing the evidence in the proper light, including undisputed evidence that does not support the findings, we conclude that no reasonable factfinder could have formed a firm belief or conviction that the Department carried its evidentiary burden, we will hold that the evidence is legally insufficient. *J.F.C.*, 96 S.W.3d at 266; *Williams*, 150 S.W.3d at

2

449. In considering factual sufficiency, we consider the entire record and ask whether the "disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *J.F.C.*, 96 S.W.3d at 266. If the disputed evidence that could not be credited in favor of the finding is so significant that a reasonable factfinder could not have formed a firm belief or conviction as to the truth of the Department's allegations, we will hold that the evidence is factually insufficient. *Id.*

## FACTUAL SUMMARY

In April 2018, the Texas Department of Family and Protective Services filed its original petition seeking conservatorship of Cary and Greg, explaining in an affidavit that law enforcement was called to a motel for a domestic disturbance and that when the police arrived, a man identified as Father fled from the scene. The affidavit stated that Father was "the aggressor in the domestic violence" and that Mother was inside a motel room, "extremely high on methamphetamines" and unable to provide information about the incident or about her children. The children were outside unsupervised in a car, wearing "soiled diapers and smelling of sour milk." Greg was strapped into a car seat while Cary was "walking around in the car and was observed to be eating toothpaste." Greg had several scratches on his body and two bruised "knots" on his forehead. Cary also had small bruises on her body.

The final hearing on the Department's petition started in March 2019 and resumed in May 2019. In March, Mother and Father testified that they were homeless and did not have a car. Father mostly criticized the Department, calling the proceeding a "witch hunt" and saying that the Department had interfered with his efforts to find employment and housing rather than helping reunite the family. He also testified that he and Mother:

have been hunted down from state to state, this is no lie, as soon as you get a job, same craziness, you are drugs, you're on drugs. And there was one time the day that I came to Court the guy had drugged me. . . . I thought it was nerves. It's been going on many, many years and it's so deep, I need the FBI, somebody, to investigate this stuff and if it's investigat[ed] I guarantee you will find what we are saying is true. It sounds like craziness. It's true. It's really happening.

Mother was asked whether she had given birth to another baby while the case was pending. She answered, "No," but said that Department caseworker Brandi Schmidt "seems to think I did." At that point, the Department's attorney said, "Your Honor, I would ask to give [Mother] her 5th Amendment pleadings and a warning that perjury is punishable by a criminal act . . . ."[3] The trial court allowed Mother's attorney "to advise her as he deems appropriate on the issue."

At the conclusion of the March hearing, the Department asked that the parents be ordered to take a hair follicle drug test. The trial court said, "So I'll make that an order that we do it on or before the end of this month," and Mother's and Father's attorneys agreed that such a deadline was acceptable.

When the hearing reconvened in May, the trial court heard testimony by Mother, Father, Schmidt, San Marcos Police Officer Ashley Allen, counselor Erin Mendoza, CASA volunteer Melissa Moore, and Alexandru Apostol. Officer Allen testified that in April 2018, when she responded to the motel's report of domestic violence, she found that "[t]he male had fled the scene" and that there "was a female in the motel room and two children in the car outside"—Greg was in a car seat, and Cary was "kind of wandering around the car" and eating toothpaste. Officer Allen testified that she saw bruises on Mother; that Mother had said Father

_____

[3] *See* U.S. Const. amend. V (privilege against self-incrimination).

4

caused the bruises; that Mother was "[c]learly under the influence of narcotics"; and that Mother never asked about the children, who were dirty, looked neglected, and were alone in the car.

Schmidt testified that the Department got involved with the family in April 2018, when the police found Cary and Greg alone in the car and told the Department that Mother was "extremely high on methamphetamines" and that Father "had fled the scene leaving the children vulnerable." The Department introduced into evidence a document signed by Mother in early April acknowledging that she had used methamphetamines and marijuana and stating, "I took it did really know what I was taking I had tried to get [Father] to go and get me some help he wouldn't." (Errors in original.) Schmidt testified that Father "informed me that he did leave the hotel," which meant he had left the children unattended with Mother.

Schmidt explained that the Department initially hoped to reunite the family but that it decided to stop visitation and seek termination in January 2019 because the parents did not provide negative hair follicle test results. Schmidt testified that Mother tested positive for drug use when the children were removed; tested negative in May, June, July, and August 2018; missed drug tests between September and December 2018; and tested positive for methamphetamines and amphetamines in January 2019. Schmidt further testified that Father took only four drug tests, that his last test—a hair follicle test taken in November 2018—came back positive for methamphetamines, and that he had not complied with the trial court's March 2019 order to take a drug test. Schmidt said the Department had concerns about the parents' abilities to care for the children because "[t]hroughout the entirety of this case, both parents have denied drug use. They haven't really shown that—they haven't articulated to me that they believe it's a problem and need help. It's always that everybody is lying, the tests are inaccurate. It's everybody making these things up."

5

In addition to the concerns about drug use, Schmidt noted that Father had not satisfied the requirements of his safety plan because he had not maintained monthly contact with the Department, provided updated contact information, submitted to random drug testing, demonstrated knowledge of protective parenting techniques, followed recommendations made in his psychological evaluation, maintained employment, or obtained safe and stable housing. Schmidt testified that Father's contact with her had been "very sporadic" and that during visitations early in the proceeding, Father refused to speak to Schmidt and at one point walked away when she tried to have a meeting with him. She also said that the parents had told her several times that they were homeless and staying in shelters or bus stops.

Schmidt acknowledged that the parents had faced challenges of homelessness and a lack of transportation. However, she noted that although they were given a card to use for transportation to parenting classes, it still took "months" before they attended the classes. Further, despite Father's completion of an eight-week protective parenting class, Schmidt did not believe he had demonstrated knowledge of how to be a protective parent because "[h]e has not been able to articulate what changes he has made. He just proceeds to say it's all a lie and . . . basically, he denies any concerns the Department has so I don't feel you can learn, demonstrate learned behavior if you have no idea of what the concerns were."

Schmidt testified that Father completed a "Psycho-Social" evaluation and a psychological evaluation but did not comply with all of the resulting recommendations. Nor did Father complete individual therapy because his therapist referred him to a psychiatric evaluation, after which he was to return to individual therapy, but Father did not complete the evaluation or return to therapy. Schmidt testified that the trial court had ordered the parents in May 2018 to attend inpatient drug treatment, which she said would have meant steady housing and clean drug

6

tests for the duration of the program and could have led to assistance with housing and employment after treatment. However, neither parent completed inpatient treatment, and although Schmidt acknowledged "some difficulty" in Father finding a ninety-day program, she also said she recommended "any inpatient he can get in," including thirty-day programs, which are easier for men to find than are ninety-day programs.

Asked whether she thought the parents should be given additional time to obtain the return of their children, given the fact that they had recently secured housing and employment, Schmidt said, "No," and, "I don't think that's fair to the children. These parents have had a year to complete services. I have no proof they are not using drugs. The last drug tests I have are positive for amphetamines and methamphetamines which is a huge concern."

Schmidt testified that Cary receives play therapy; that both children receive speech, occupational, and physical therapy; and that the children's foster home was meeting their needs and would be able to continue to do so in the future. Schmidt believed termination was in the children's best interest because the parents have "a long history of methamphetamine use," the Department had concerns about domestic violence and unaddressed mental health issues, the parents had not shown they could provide safe and stable housing for the children, and the parents had not "been able to demonstrate changes in their behaviors." Schmidt said:

> They have not been able to show that they can provide a safe and stable environment for these children. Since being in foster care, both children have made huge progress. They are completely different children. They are talking and they are moving and walking and doing things they were not doing previous. The therapist had stated it's imperative they have a structured environment to continue the growth and I don't believe the parents can provide a structured, stable environment for these children.

7

Erin Mendoza, a therapist who saw both Mother and Father, testified that Father completed an eight-session protective parenting class and that he was "usually disruptive" when he participated in the class and made statements about how the Department "is at fault or the legal system was at fault." Father never recognized the danger in which he had placed the children and did not appear to have "applied the information he heard" in class. Mendoza explained that "he throughout the course was still defensive and not recognizing the things that he could change in his own personal life to be a more protective parent." Mendoza testified that she also saw Father for several sessions of individual therapy. However, she paused therapy because she wanted Father to complete a psychiatric evaluation before continuing, and Father never completed that evaluation or resumed therapy. Mendoza had recommended the psychiatric evaluation because of Father's instability and "some of his statements" and because it "seemed like he was fixated on feeling there was a conspiracy against him and that was a red flag for me."

Mendoza did not think Father understood the seriousness of the Department's involvement with the family, and she said her concerns about his parenting abilities arose from "his mental health and just his perception of reality and making sure that he's mentally healthy." Asked whether it would be in the children's best interest for the parents to be given more time, given their recent employment and housing, she said, "I guess the answer would be no. I haven't—based on them not following through with the service in the past that I recommended." She also said that "they have had a lot of time to be doing the services" but had not followed through on Mendoza's recommendations.

Melissa Moore, the children's CASA volunteer, testified that during the several months in which she supervised visitations between the children and Father, she "started to feel a little uncomfortable with the interactions with" Father and took steps to ensure that someone else

8

was present when she had to interact with him. Asked what made her uncomfortable, Moore said, "The way he would act and behave in front of me I would observe and then one day outside of Court when he approached myself and my supervisor, it was erratic." Moore said her concerns about Father and Mother's parenting abilities "involve a few issues. One that we have seen the drug reports coming back inconsistently positive and negative. And then the continuation that after a couple of negative, they continue—they had no shows, even after the negatives. And so that was one of my first concerns that we could not display that they were, in fact, staying away from drugs. Additionally, is the behavior that I observed in and out of the courtroom that is of concern." Moore said she had no reason to believe that the parents' drug test results were falsified or otherwise incorrect. Moore also testified that she had only learned that the parents had obtained employment and an apartment from the testimony that day. She did not think Father could meet the children's emotional or physical needs now or in the future or provide a stable and secure home for them, and she believed they would be at risk if returned to his care. Moore said the parents had had sufficient time to complete services and could have finished most of them if they had participated more fully. Moore believed that there were "more issues than homelessness and poverty" and did not believe the parents had worked hard to address the issues within their control.

Moore testified that the children were bonded with their foster family and that it was her "understanding" that the "current placement would lead to permanency for the children." Moore said that the children were in several forms of therapy and had "needs that need to be addressed." She believed that the foster home was meeting those needs and could provide for their physical and emotional needs now and in the future and that it was in the children's best interest for the parents' rights to be terminated.

9

Mother denied using methamphetamine on the day the children were removed; denied that Father had fled the scene "because of the domestic violence"; denied endangering the children; and insisted she had simply run into the motel room to get bottles for them. Mother denied being under the influence of drugs during the incident and denied that a hair follicle test taken the day after the incident was positive for methamphetamines, contrary to the Department's contention. Asked why she had signed the acknowledgement of substance abuse, she said, "I told them I took something that I did not know what it was" and that at the time, she "had reason to believe it was [methamphetamine]. That's what it looked like." Mother explained that while her children were with her and asleep, she had taken a substance that she found under a park bench. Although she thought it was methamphetamine, she "didn't know what it was," and "when the drug test results come back, there was nothing in my system." Mother also denied using drugs with Father and said she never saw him using drugs.

Father testified that he, Mother, and their children had arrived in central Texas from another state shortly before the incident at the motel, hoping that Father could find work. They had about $6,000 and their car, both of which they lost when the car was impounded after Mother's arrest and the children's removal. Father insisted that he was not present at the motel when the police were called and that he had not left the children alone in the car. Instead, he said that he gave them baths and put them to bed before he left the motel. Asked whether Mother was high when he left, he said, "I have no idea of her using any drugs. I never seen her use no drugs," and, "My wife was . . . a little bit hysterical. She's been through a lot of trauma."

Father testified that about five weeks before the hearing in May, he and Mother had found regular employment and an apartment. He explained that before then, he had not been able to maintain a steady job because he "had to keep coming back here" to court proceedings.

10

Father blamed many of the family's problems on the Department, his attorney, and the court system. When asked if the proceeding was "a conspiracy against" him and Mother, he said, "That's very difficult to answer. I don't know how to answer that. Conspiracy is such a broad thing. Define what you mean by conspiracy?" He denied having convictions for family violence, denied assaulting Mother, admitted that several proceedings for protective orders had been filed against him, and said that "all of the cases were non-founded."

Father admitted that he pled guilty in 2006 to a federal charge of conspiracy to distribute fifty grams or more of methamphetamine. He also admitted smoking marijuana and using methamphetamine in the past but denied any current use of illegal drugs, denied using any drugs while in Texas, and said he had not had any "truthful" positive drug tests during this case. He asserted that there were "discrepancies" with the drug tests administered to him and said he had refused to take the drug test ordered after the March hearing because of those discrepancies. Father testified that one of Mother's lawyers had "said don't take no more [drug tests], they are up to something." Father insisted that Mother was a good mother and that in the seven years he had been with Mother, he had never seen her use drugs.

Father denied that he had failed to complete individual therapy, saying that Mendoza cancelled two sessions, that he went to three sessions, and that he "did complete [therapy]. They told me she was done, she couldn't help me. She was recommending me to go see some other specialist and I never got any information about the other specialist." Asked why he did not complete the court-ordered inpatient drug treatment program, Father said he had gone to "all of them" but that "[i]t's impossible. You can't go if they don't accept you." He said that someone at a drug screening center told him that they "don't in-house people just because they are homeless" and that "she didn't really think I had a drug problem because there were three

11

hair strands in the report. She didn't believe they were true, either. She said nobody gets three hair strands in a month-and-a-half. I told her, I didn't take three hair strands." Father agreed he "could have maybe tried harder to get in some kind of drug program to appease CPS" but explained that it was difficult to work in Austin, where he had found work, and then return to San Marcos for Department requirements. Father thought he could have done "a little more maybe" if he and Mother had not lost their car and money following the incident at the motel.

The subject of Mother having given birth while the case was pending was broached again during the May hearing. Mother was asked whether she had a child while the case was pending and said, "I plead the 5th," while Father testified that to his knowledge, Mother did not have a baby while the case was pending. However, the Department introduced into evidence an affidavit signed by Mother on August 25, 2018, relinquishing her parental rights to a son who was born August 23, 2018.

Alexandru Apostol testified that the parents had been working for him for the last four or five weeks. He had been paying the parents' rent directly to their new landlord, and they were paying him back through their paychecks. He had also been helping provide them with transportation until they can afford a car. Apostol testified that his company generally requires drug testing of prospective employees and that he was "pleasantly surprised" when Mother and Father asked if they could take a hair follicle test. He had not yet received the results from those drug tests, but he said the parents did not show signs of drug use and had thus far "behave[d] normally, like any other employee, solid, very industrious and handy."

12

## DISCUSSION

We review a trial court's best-interest determination in light of the considerations set out in *Holley v. Adams*, taking into account the children's wishes, their emotional and physical needs now and in the future, present and future emotional or physical danger posed to the children, the parenting skills of those seeking custody, any programs available to assist those seeking custody to promote the children's best interest, plans for the children's future, the stability of the home or proposed placement, conduct by the parent that might show that the parent-child relationship is inappropriate, and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The children's need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs. *L.R. v. Texas Dep't of Family & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at *1 (Tex. App.—Austin June 21, 2018, no pet.) (mem. op.); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). A parent's rights may not be terminated merely because the children might be better off living elsewhere, but the factfinder may consider whether termination and adoption versus an impermanent foster-care arrangement would better serve the children's best interest. *See L.R.*, 2018 WL 3059959, at *1.

The children were very young at the time of the hearing, and therefore there was little testimony about their wishes, other than testimony that the children love their parents but also have bonded with their foster parents and are thriving in their care. *See M.R. v. Texas Dep't*

13

*of Family & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at *3 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.) (factfinder may consider that child has bonded with current placement, is well cared for by them, and has spent minimal time with parent). Department witnesses testified that the children receive several kinds of therapy and were developing well, although Mother denied that the children had any need for therapy. Moore and Schmidt both testified that the foster home was meeting the children's needs and would continue to do so in the future. Moore also said she believed the children's current foster placement would likely become permanent.

"[A] fact finder may infer that past conduct endangering the well being of a child may recur in the future if the child is returned to the parent." *Williams*, 150 S.W.3d at 451. The Department got involved with the family after a report of domestic violence, and when they arrived, they found Mother under the influence of drugs while the children were alone in the car. Cary was "wandering" the car and eating toothpaste, Greg was strapped into a car seat, and both children were dirty and looked neglected. Mother signed a document acknowledging using methamphetamines and marijuana, although at trial she testified that she no longer believed that the substance she had used—a substance she found under a bench in a park and ingested while the children were in her care—was methamphetamines. Although Father denied that he was present, Schmidt testified that he told her he had been present at the motel, and the police reported that he had fled the scene. Mother had visible bruises, and she told the police that those bruises had been caused by Father. Department witnesses indicated that the parents' behavior through the case was confrontational and erratic. We cannot second-guess the trial court's resolution of credibility or evidentiary conflicts. *See A.B.*, 437 S.W.3d at 503.

14

Although Father denied using drugs at the time of the incident or during the proceeding, Department evidence indicated that he tested positive for methamphetamines in January 2019, and he failed to take numerous requested drug tests. The trial court could have inferred from Father's failure to take some of the requested drug tests, including the one ordered in March 2019, that he was avoiding testing because he was using drugs. *See E.S. v. Texas Dep't of Family & Protective Servs.*, No. 03-13-00846-CV, 2014 WL 2448662, at *3 (Tex. App.—Austin May 30, 2014, no pet.) (mem. op.); *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.); *In re J.T.G.*, 121 S.W.3d 117, 131 (Tex. App.—Fort Worth 2003, no pet.); *In re D.M.*, 58 S.W.3d 801, 813 (Tex. App.—Fort Worth 2001, no pet.).

The parents were homeless and unemployed throughout the case, until about a month before the May hearing. Although they had recently obtained employment and housing, that development was very recent, and "evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past." *Smith v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.). The Department produced evidence that the children's foster placement was meeting the children's needs, that it would continue to do so in the future, and that the placement would likely be permanent. The children's need for permanence is of primary consideration, a fact testified to by Schmidt and Moore in explaining why they recommended termination. *See L.R.*, 2018 WL 3059959, at *1; *D.R.A.*, 374 S.W.3d at 533. Considering this record as a whole, we cannot conclude that the evidence is legally or factually insufficient to support the trial court's best-interest determination. We overrule Father's issue on appeal.

## CONCLUSION

We have overruled Father's issue on appeal. Further, in our review of the record, we agree with Mother's attorney that the appeal is frivolous and without merit. We affirm the trial court's order of termination.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Triana and Smith

Affirmed

Filed:   October 23, 2019